**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

CHRISTOPHER COOLEY,

          Plaintiff,

      v.

CLIFFORD G. LISMAN,

          Defendant.

Civil Action No. 16-4499 (MAS) (ZNQ)

**MEMORANDUM OPINION**

**SHIPP, District Judge**

This matter comes before the Court upon Plaintiff Christopher Cooley's ("Plaintiff") Motion to Enforce Settlement. (ECF No. 104.) Defendant Clifford G. Lisman ("Defendant") opposed the Motion (ECF No. 111), and Plaintiff replied (ECF No. 113). The Court has carefully considered the parties' arguments and decides the matter without oral argument pursuant to Local Civil Rule 78.1. For the reasons set forth herein, Plaintiff's Motion to Enforce Settlement is granted.

I.    **BACKGROUND**

    A.    **Factual Background**

Defendant was the owner, director, and sole officer of WEBCO Dental and Medical Supplies, Inc. ("WEBCO"), a New Jersey corporation in the business of distributing medical and dental supplies and equipment. (Am. Compl. ¶¶ 9–11, ECF No. 88.) Defendant was also the President and CEO of Dental Health Associates, P.A. ("DHA"), a multi-location dental practice. (*Id.* ¶ 20; Certification of Clifford G. Lisman ¶ 1 ("Lisman Certification"), ECF No. 111-2.) On August 1, 2013, Plaintiff and Defendant entered into an agreement under which Plaintiff would

purchase 90% of all issued and outstanding stock of WEBCO from Defendant for $995,000 (the "Purchase Agreement"). (Am. Compl. ¶¶ 12–13.) As part of the Purchase Agreement, Defendant issued Plaintiff two loans. (*Id.* ¶¶ 14–18.) The first loan was in the amount of $595,000 and was to be repaid with interest four months after December 1, 2013 (the "Execution Date"). (*Id.* ¶ 15.) The second loan was in the amount of $400,000 and was to be repaid in monthly payments, consisting of principal and interest, over a five-year period starting from the Execution Date. (*Id.* ¶ 17.) The Purchase Agreement also included a provision that reduced Plaintiff's repayment obligations if DHA's inventory and supply purchases from WEBCO dropped below 90% of DHA's 2012 purchasing levels.[1] (*Id.* ¶ 22; *see also* Lisman Certification ¶ 5.)

Following the execution of the Purchase Agreement, Plaintiff failed to pay off the loans, (Am. Compl. ¶ 25; Lisman Certification ¶¶ 12–14), and the parties agreed to modify Plaintiff's payment obligations, (Am. Compl. ¶ 26; Lisman Certification ¶ 14). In September 2014, the parties entered into a second agreement under which Plaintiff would purchase the remaining 10% of WEBCO from Defendant ("Final Stock Transfer Agreement"). (Am. Compl. ¶ 31; Final Stock Transfer Agreement *2–6, ECF No. 88-4.) This agreement did not modify the Purchase Agreement and its accompanying loans. (*see generally* Final Stock Transfer Agreement *2–5.)

In January 2016, Defendant sold DHA to a third party, (Am. Compl. ¶ 36; Lisman Certification ¶ 9), who, in turn, ceased conducting business with Plaintiff and WEBCO, (Am. Compl. 38; Lisman Certification ¶ 10). Plaintiff subsequently filed a Complaint against Defendant in the United States District Court for the Middle District of Florida alleging (1) breach of contract,

---

[1] The provision stated that, if DHA inventory and supply purchasing "drops below . . . [90%] of the 2012 level ($950,000.00), then the above referenced loan is reduced by each percentage point or portion thereof below the stated . . . [90%] 2012 threshold; provided however, [Defendant] shall be entitled to a credit in fulfillment of that obligation for, purchases of equipment which exceed . . . [$150,000] annually, or for sales of third parties from the efforts or referral of [Defendant]." (Am. Compl. ¶ 22.)

(Compl. ¶¶ 47–52, ECF No. 1), and (2) breach of the implied duty of good faith and fair dealing, (*id.* ¶¶ 53–58). Plaintiff also sought declaratory relief stating the loan reduction provision had been triggered after DHA's purchases dropped. (*Id.* ¶¶ 39–46.) Plaintiff asserted that his obligation had effectively been reduced to $0 and he was, therefore, entitled to reimbursement for previous payments already made. (*Id.*) The matter was transferred to this Court (M.D. Fl. Order 1, ECF No. 9), and Plaintiff subsequently filed an Amended Complaint.[2]

On December 6, 2016, the Honorable Lois H. Goodman, U.S.M.J., issued an order appointing a mediator, (ECF No. 26), but was later informed by the parties that the mediation failed to successfully resolve the matter, (Pl.'s Feb. 2, 2017 Correspondence, ECF No. 27). On October 18, 2017, the parties informed the Court of a settlement and the Court administratively terminated the action for sixty days pending consummation of settlement. (ECF No. 48.) Plaintiff and Defendant, however, failed to finalize the settlement during the administrative termination, and the Court reopened the matter on May 8, 2018. (ECF No. 63.) On November 7, 2019, Defendant informed the Court that settlement discussions had resumed. (Def.'s Nov. 7, 2019 Correspondence, ECF No. 100.)

Defendant reinitiated settlement discussions on November 6, 2019.[3] (Pl.'s Moving Br. Ex. 1 *4 ("November 2019 Settlement E-mail Messages"), ECF No. 104-2.) Defendant made an

---

[2] Plaintiff's Amended Complaint "remove[d] issues related to jurisdiction and venue in Florida, add[ed] facts not available at the time the original complaint was filed, and otherwise correct[ed] and conform[ed] the [C]omplaint. The substantive elements of the counts in the [C]omplaint remain[ed] the same." (Pl.'s Req. to File Am. Compl., ECF No. 14; *see also* Am. Compl. ¶¶ 41–60.)

[3] Briefing from both parties include an identical e-mail message conversation dated from November 6, 2019 to November 20, 2019. (*See generally* Pl.'s Moving Br. Ex. 1, ECF No. 104-2; Def.'s Opp'n Br. 8–23, ECF No. 111.) For the purposes of this Opinion, the Court cites to Plaintiff's Exhibit when discussing this conversation.

offer, on which Plaintiff sought clarification and specificity as to what was being proposed. (*Id.* at

*3–4.) After several e-mail messages between the parties, Defendant ultimately stated:

> I am at a complete loss as to your confusion [regarding terms. They
> are] as clear as [they] could be.[ T]hat said[:]
>
> If your client dismisses whatever claims he believes he has, my
> client will dismiss all claims, including those for the nonpayment of
> the note and ongoing purchase requirements as previously stated.
>
> Since your client agreed to purchase the remaining 10%[]stock for
> $5,000, mine wants that payment[. A]dditionally[,] my [client]
> wants a flat $5,000[] to reimburse him for part of the expenses
> incurred with the controversy associated with the final stock
> transfer aspect.
>
> I will review whatever settlement document you offered to
> prepare[. S]ince you are plaintiff [it's] appropriate for you to do so.
>
> We have a[n] in court conference coming up[. U]nless you advise
> that the terms are acceptable[,] I will request the court convert the
> conference into a settlement conference with clients present so that
> this case might wrap up.

(*Id.* at *3–4.) Minutes later, Plaintiff sent Defendant an e-mail message, stating, "I accept your

offer." (*Id.* at *2–3.) Later that day, Plaintiff sent Defendant settlement documents containing the

terms of the agreement, but did not receive a response. (*Id.* at *2.)

On November 20, 2019, Plaintiff informed Defendant that the two $5,000 payments would

be available for tender at the already-scheduled November 21, 2019, status conference with Judge

Goodman. (*Id.*) Later that day, Defendant replied to Plaintiff's e-mail message with "significant

comments" on the proposed settlement documents and stated that, "[i]n light of the history of this

matter[,] I am not warm on the idea of putting through a settlement without fully negotiated and

executed documents in place." (*Id.*) Plaintiff offered to consider Defendant's comments "to the

extent they are consistent with the offer and acceptance we exchanged on . . . Nov[ember] 14,

2019." (*Id.*) Defendant, however, informed Plaintiff that he was "uncomfortable with proceeding

4

as you proposed by putting through a settlement without execution of documents and further discussions." (*Id.*) Defendant also informed Plaintiff that, since the resumption of settlement discussions, new information had come to Defendant's attention that he needed to consider before proceeding. (*Id.*) Defendant stated he would "advise the Court that[,] while [the parties] are in the midst of settlement discussions, the case remains opens." (*Id.*) On December 5, 2019, Plaintiff filed the instant Motion to Enforce Settlement.

### B.    Parties' Positions

#### 1.    Plaintiff's Position

Plaintiff asserts that, despite Defendant's reservations about moving forward without execution of documents and the undisclosed new information, the parties entered into a valid, enforceable settlement agreement on November 14, 2019. (Pl.'s Moving Br. 1, 9–10,[4] ECF No. 104-1.) After Plaintiff's numerous requests for clarification and exactness, Defendant "provided[, via e-mail message,] a precise, complete, [and] unequivocal offer of settlement," (*id.* at 4), which Plaintiff accepted, (*id.* at 5). Plaintiff, therefore, requests the Court enforce the settlement agreement between the parties, which consists of the following terms: (1) payment of $5,000 from Plaintiff to Defendant for Defendant's remaining 10% of WEBCO stock; (2) payment of $5,000 from Plaintiff to Defendant for expenses incurred with the Final Stock Transfer Agreement; and (3) dismissal of the parties' claims against each other. (*Id.* at 6, 9–10.)

#### 2.    Defendant's Position

Defendant contends that the parties did not reach a valid, enforceable settlement agreement. (*See generally* Def.'s Opp'n Br. 1–7, ECF No. 111.) First, Defendant asserts that, "[d]uring the

---

[4] Plaintiff's Moving Brief contains two first pages: one for the Table of Authorities and one for Plaintiff's first argument. For the purposes of this Opinion, the Court treats the first page of Plaintiff's argument as page one of the Moving Brief.

course of settlement negotiations, Defendant discovered that Plaintiff filed an [a]ffidavit in connection [with] Plaintiff's potential run for political office in Florida." (*Id.* at 4.) According to Defendant, Plaintiff represented in the affidavit that his net worth was $700,000.[5] (*Id.*) Plaintiff's net worth, Defendant argues, contradicts the assertions Plaintiff made throughout the parties' contractual relationship and the instant litigation. (*Id.*; *see also* Lisman Certification ¶¶ 12–13, 18 ("Time and time again, Plaintiff would 'cry poor' . . . .").) These misrepresentations caused Defendant to consider resolving the litigation because of "the unlikelihood that Defendant would ever receive the just compensation he deserved to satisfy the terms of the original agreement between the parties." (Def.'s Opp'n Br. 4.) Defendant contends that, absent these misrepresentations, he would not have entered into a settlement agreement. (*Id.* at 4–5; Lisman Certification ¶ 24 ("I want to emphasize, the only reason to settle was Plaintiff's constant representations to his inability to obtain financing.").) Defendant argues, therefore, that the settlement agreement "is not free of fraud and contains compelling circumstances that must render [it] unenforceable." (Def.'s Opp'n Br. 4–5.)

Alternatively, Defendant asserts that no enforceable agreement exists because "the parties did not agree on the essential terms of the agreement[,] nor did they manifest an intention to be bound by those terms." (*Id.* at 5.) Defendant contends that, from the start of the settlement discussions, "representations, warranties[,] and indemnification in [Defendant's] favor" were "essential aspect[s]" of any potential settlement agreement. (*Id.*) According to Defendant, when Defendant sent the November 14, 2019, offer e-mail message, Defendant had not waived the initial requirement of "representations, warranties[,] and indemnification in [Defendant's] favor." (*Id.*

---

[5] Defendant fails to produce evidence of this affidavit, and does not allege when he or his counsel discovered it.

at 6.) The subsequent proposed agreement Plaintiff sent, however, did not include such language, (*id.* at 5, 25–31), and the parties, therefore, did not agree on an essential element, (*id.* at 6.)

Finally, Defendant notes that Plaintiff's proposed settlement agreement contains language dismissing the case with prejudice and "releas[ing] and forever discharg[ing]" Plaintiff from any and all actions "Defendant now has or may have had from the beginning of the world to the date of [the settlement agreement]." (*Id.* at 6, 27.) Defendant, however, intended that any agreement would dismiss the matter without prejudice. (*Id.* at 6–7.) Defendant argues that these discrepancies preclude a valid, enforceable agreement between the parties and the Court should, therefore, deny Plaintiff's motion. (*Id.*)

## II.   LEGAL STANDARD

"The stakes in summary enforcement of a settlement agreement and summary judgment on the merits of a claim are roughly the same—both deprive a party of his right to be heard in the litigation." *Tiernan v. Devoe*, 923 F.2d 1024, 1031 (3d Cir. 1991). Courts, therefore, treat a motion to enforce a settlement under the same standard as a motion for summary judgment, *id.* at 1032, and grant the motion when the moving party demonstrates that there is no genuine issue of material fact and the evidence establishes the moving party's entitlement to judgment as a matter of law, *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

A settlement agreement between parties in a lawsuit is a contract and, therefore, governed by state contract law. *Jacob's Limousine Transp., Inc. v. City of Newark*, 688 F. App'x 150, 151 (3d Cir. 2017); *Excelsior Ins. v. Pennsbury Pain Ctr.*, 975 F. Supp. 342, 348–49 (D.N.J. 1996). "A contract arises from offer and acceptance, and must be sufficiently definite 'that the performance to be rendered by each party can be ascertained with reasonable certainty.' Thus, if parties agree on essential terms and manifest an intention to be bound by those terms, they have created an enforceable contract." *Weichert Co. Realtors v. Ryan*, 608 A.2d 280, 284 (N.J. 1992)

(internal citations omitted) (quoting *Borough of W. Caldwell v. Borough of Caldwell*, 138 A.2d 402, 410 (N.J. 1958)). Additionally, contracts must be accompanied by consideration. *Excelsior*, 975 F. Supp. at 349. Furthermore, "[i]n bilateral contracts or agreements, such as the one in the case at hand, where the parties make mutual promises to do some future act, 'the consideration of the promise of one party is a promise on the part of the other.'" *Id.* (quoting *Friedman v. Tappan Dev. Corp.*, 126 A.2d 646, 651 (N.J. 1956)).

Despite these requirements, a settlement agreement does not need to contain every possible term to be enforceable. *Bistricer v. Bistricer*, 555 A.2d 45, 47 (N.J. Super. Ct. Ch. Div. 1987). Rather, "[s]o long as the basic essentials are sufficiently definite, any gaps left by the parties should not frustrate their intention to be bound." *Id.* (citation omitted). "[A]s long as those essential terms are agreed to, 'the settlement will be enforced notwithstanding the fact . . . [the] writing does not materialize because a party later reneges.'" *McDonnell v. Engine Distribs.*, No. 03-1999, 2007 WL 2814628, at *3 (D.N.J. Sept. 24, 2007) (quoting *Lahue v. Pio Costa*, 623 A.2d 775, 788 (N.J. Super. Ct. App. Div. 1993)). This is true "even [if the parties] contemplate the later execution of a formal document to memorialize their undertaking." *United States v. Lightman*, 988 F. Supp. 448, 459 (D.N.J. 1997).

Finally, in New Jersey, there is a strong public policy in favor of settlements. *Nolan v. Lee Ho*, 577 A.2d 143, 146 (N.J. 1990). Courts, therefore, will "strain to give effect to the terms of a settlement whenever possible." *Dep't of Pub. Advocate, Div. of Rate Counsel v. N.J. Bd. of Pub. Utils.*, 503 A.2d 331, 333 (N.J. Super. Ct. App. Div. 1985); *see also Borough of Haledon v. Borough of N. Haledon*, 817 A.2d 965, 975 (N.J. Super. Ct. App. Div. 2003). Despite this strong policy favoring settlements, a court will not enforce a settlement agreement "where there appears to have been an absence of mutuality of accord between the parties or their attorneys in some

8

substantial particulars, or the stipulated agreement is incomplete in some of its material and essential terms." *Bistricer*, 555 A.2d at 47 (citation omitted).

III.   **DISCUSSION**

A.   **A Settlement Contract Exists**

The Court is satisfied that the parties entered into a binding settlement contract. As noted above, "if parties agree on essential terms and manifest an intention to be bound by those terms, they have created an enforceable contract." *Weichert*, 608 A.2d at 284. This is true even if the parties "leav[e] the [other] details to be 'fleshed out' in a writing thereafter." *Excelsior*, 975 F. Supp. at 349.

Here, the following facts are undisputed: Defendant reinitiated settlement discussions on November 6, 2019. (November 2019 Settlement E-mail Messages *4.) Defendant subsequently extended Plaintiff an offer on November 14, 2019, which included: (1) a $5,000 payment from Plaintiff to Defendant for the remaining 10% of WEBCO stock; (2) a $5,000 flat fee payment from Plaintiff to Defendant for costs incurred from the Final Stock Transfer Agreement; and (3) a dismissal of all charges in the present litigation by both parties. (*Id.* at *3.) Plaintiff accepted this offer. (*Id.* at *2–3.)

Defendant's offer came after Plaintiff's numerous requests for clarity and exactness in the offer. (*Id.* at *3–4 ("Please be clear and precise about exactly what you are saying if you want this to move forward.").) After reassuring Plaintiff the terms were "clear as [they] could be," Defendant stated that "[w]e have a[n] in court conference coming up[. U]*nless you advise that the terms are acceptable*[,] I will request the [C]ourt convert the conference into a settlement conference with clients present so that this case might wrap up." (*Id.* at *3 (emphasis added).) From a review of this record, the Court finds that Defendant's November 14, 2019, e-mail message constituted a valid offer, that Plaintiff accepted that offer by e-mail message on the same date, and that the

parties agreed, after numerous attempts by Plaintiff for clarification, on the essential terms of the settlement agreement and intended to be bound by those terms.

Defendant asserts that the parties did not enter into an enforceable settlement agreement because the parties failed to agree on essential terms: (1) "customary representations, warranties[,] and indemnification in [Defendant's] favor" and (2) dismissal without prejudice. (Def.'s Opp'n Br. 5–7.) The Court is unpersuaded by this argument. First, Defendant suggests that the "customary" representation, warranty, and indemnification terms he proposed included, "[a]t the very least, . . . tax returns, a list of assets and liabilities, and net worth calculations certified by an accountant." (Certification of Harry Jay Levin ¶ 8, ECF No. 111-1; Lisman Certification ¶¶ 31–32.) But it appears that Defendant only now claims these terms are "essential" elements to repudiate the settlement agreement. Defendant included these terms in but one e-mail message and merely described them as "customary." (November 2019 Settlement E-mail Messages *4.) Furthermore, Defendant failed to include these terms in the several e-mail messages exchanged between the parties after Plaintiff sought clarification and exactness. (*See generally id.* *3–4.) These "customary" terms, therefore, were not essential to the parties' agreement and were simply details to be "fleshed out" in a later writing. *See Excelsior*, 975 F. Supp. at 349.

Also unconvincing is Defendant's assertion that the parties failed to agree on the essential term of dismissal without prejudice; Defendant's argument contradicts the intention of both parties and common sense. Defendant notes that his November 2019 e-mail message subject line stated "Re: S[ettlement] D[iscussions] W[ithout] P[rejudice]." (Def.'s Opp'n Br. 6, 9.) Defendant argues that this subject line indicates that any offer he made included the essential term of dismissal without prejudice, (*id.* at 6–7), and Plaintiff's inclusion of dismissal with prejudice in the proposed settlement agreement illustrates an absence of agreement, (*id.* at 7). Notwithstanding the e-mail message subject line, the parties' subsequent e-mail messages do not discuss the issue of prejudice,

10

nor do they explicitly state that dismissal was to be enforced with or without prejudice. (November 2019 Settlement E-mail Messages *2–4.) In fact, after Plaintiff accepted Defendant's offer, Plaintiff sent the proposed agreement including dismissal with prejudice, to which Defendant only expressed concerns on indemnification, payments, and the execution of settlement documents. (*Id.* at *2.)

Furthermore, dismissal without prejudice would not settle the matter in the way the parties appeared to desire in their communications. (*Id.* at *2–4.) For example, Defendant stated in four separate e-mail messages: (1) "Will your client walk away from ALL claims if [Defendant] does as well[?]"; (2) "Now, is [Plaintiff] prepared to dismiss everything and I mean everything or not[?]"; (3) "Is or is not your client ready to dismiss all charges if mine does the same?"; and (4) "If your client dismisses whatever claims he believes he has, my client will dismiss all claims[.]" (*Id.* at *3–4 (emphasis in original).) Plaintiff also stated throughout the settlement discussions that "I expect the other matters to fall into place to fully resolve the pending litigation and bring the matter to a full conclusion." (*Id.* at *3.)

Finally, here, dismissal without prejudice ignores common sense. *See A.D.L. v. Cinnaminson Twp. Bd. of Educ.*, 975 F. Supp. 2d 459, 466 n. 3 (D.N.J. 2013) (rejecting defendant's contract interpretation, in part, because the "interpretation . . . defie[d] common sense and the normal course of most contractual agreements"). Dismissal without prejudice would allow Defendant to refile his present claims against Plaintiff after receiving $10,000, and Plaintiff to restart the current, four-year litigation after receiving the final 10% of WEBCO. *Papera v. Pa. Quarried Bluestone Co.*, 948 F.3d 607, 610 (3d Cir. 2020) ("Only a prior dismissal with prejudice . . . precludes later relitigating the dismissed claims."). Such an agreement would not "wrap up" the present action nor "bring [it] to an end" as the parties discussed. (November 2019

Settlement E-mail Messages *2–3.) Accordingly, the Court finds that the parties agreed to dismissal of the present matter and that such dismissal be with prejudice.

A review of the record indicates that the parties agreed to the material terms of the settlement offer, but Defendant had second thoughts. Defendant's "buyer's remorse," however, does not constitute grounds to repudiate the settlement agreement. The settlement agreement, therefore, is a valid contract that must be enforced absent "fraud or other compelling circumstances." *Nolan*, 577 A.2d at 146.

## B.   Settlement Contract Is Not Vacated for Misrepresentation

"Before vacating a settlement agreement, our courts require 'clear and convincing proof' that the agreement should be vacated." *Nolan*, 577 A.2d. at 146 (citing *De Caro v. De Caro*, 97 A.2d 658, 661 (N.J. 1953)). "[T]he party seeking to set aside the settlement agreement has the burden of proving . . . extraordinary circumstances sufficient to vitiate the agreement." *Jennings v. Reed*, 885 A.2d 482, 488 (N.J. Super. Ct. App. Div. 2005). To that end, Defendant must demonstrate "a material misrepresentation made with intent that it be relied on, coupled with actual detrimental reliance." *Nolan*, 577 A.2d. at 146.

Defendant argues that, during the reinitiated November 2019 settlement discussions, he became aware of an affidavit Plaintiff had filed in connection with a potential run for public office, which represented Plaintiff's net worth was $700,000. (Def.'s Opp'n Br. 4; Lisman Certification ¶ 27.) Defendant also asserts that "[t]here are . . . filings claiming that Plaintiff's worth is millions of dollars." (Lisman Certification ¶ 27.) Defendant, however, fails to provide copies of these documents, despite certifying that they are attached to his filings. (*Id.*) Although Defendant alleges that Plaintiff represented he was unable to secure financing to pay off the loans, (Answer and Countercl. 8–9, ECF No. 16; Lisman Certification ¶¶ 12, 24; Def.'s Opp'n Br. 4), Defendant fails

12

to establish that this characterization was a misrepresentation, (*see generally* Lisman Certification; Def.'s Opp'n Br. 4–5).

Defendant, therefore, does not establish by clear and convincing evidence that Plaintiff made a material misrepresentation regarding his financial situation with the intent it be relied upon, and that Defendant detrimentally relied upon that misrepresentation. Accordingly, the Court will not vacate the settlement agreement on this basis.

## IV.    CONCLUSION

For the reasons set forth above, Plaintiff's Motion to Enforce Settlement is granted. The Court will enter an Order consistent with this Memorandum Opinion.

MICHAEL A. SHIPP
UNITED STATES DISTRICT JUDGE